**IN THE DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| The United States of America, *ex rel*, | ) | C/A No.: 2:20-cv-00250-DCN |
| JARED GUICHARD, | ) | |
| | ) | **QUI TAM COMPLAINT** |
| Plaintiff-Relator, | ) | **JURY TRIAL DEMANDED** |
| | ) | **(FILED UNDER SEAL)** |
| v. | ) | |
| | ) | |
| TeamHealth Holding, Co., d/b/a | ) | |
| TeamHealth, Inc., HCA Healthcare, Inc., | ) | |
| HCA South Atlantic, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NOW, BY AND THROUGH UNDERSIGNED COUNSEL OF RECORD, Plaintiff-Relator Jared Guichard, MD, ("Plaintiff Guichard," or "Relator Guichard," "Plaintiff-Relator"), on behalf of the United States Government and himself, brings this Complaint against the above-named Defendants, and would demonstrate unto the Court as follows:

## I.     NATURE OF THE CASE

1.     This is an action brought under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*. as well as state statutory and/or common law, to recover damages and civil penalties from the Defendants on behalf of the United States Government, and individually for Plaintiff Guichard.

2.     As set forth herein, at all times relevant to this Complaint, Defendants Team Health Holding, Co., d/b/a Team Health, Inc., ("Defendant TeamHealth"), HCA South Atlantic Division, and HCA Healthcare, Inc. on behalf of Trident Medical Center in Charleston, South Carolina ("Defendant HCA", "Defendant HCA Trident"), jointly and severally, and by and through their employees, agents, and assigns, have been engaged in a fraudulent scheme to cause physicians and other healthcare professionals to create records seeking payment for medical services provided to

patients who are beneficiaries of Government third-party payors including Medicaid, Medicare, Tricare, and affiliated managed care organizations.

3.     As set forth herein, Defendants were engaged in a scheme to record and collect amounts for more expensive and excessive levels of medical services than indicated for patient clinical conditions, and excessive numbers of patients beyond that which a practitioner could reasonably see in a day.

4.     Moreover, after prompting employees to record excessive levels of service and at greater expense than was warranted, and for a volume of patients beyond what a practitioner could reasonably see in a day, Defendants knowingly submitted, caused to be submitted, or by their abstention, authorized the submission of claims for reimbursement to Governmental third-party payors including Medicaid, Medicare, Tricare, and affiliated managed care organizations, and accepted reimbursement for these unauthorized charges.

5.     At all times relevant to this Complaint, Relator Guichard was a hospitalist employed by Defendant HCA and Defendant TeamHealth, and working for Defendant HCA's North Charleston Campus at Trident Medical Center. Relator Guichard is uniquely situated to provide details about Defendants' excessive and improper billing schemes, as he was employed by Defendants, and compensated pursuant to Defendants' scheme, and operated as a physician-advisor for Defendant HCA, performing utilization review for Defendant's North Charleston Campus.

6.     In his capacity as a physician-advisor, Relator Guichard collected and created admissions and diagnoses metrics for certain Diagnosis Related Groups (DRGs), and has first-hand knowledge of the facts set forth herein, which he brought to the attention of his supervisors, only to be ignored, and ultimately terminated from his position. These facts include but are not

limited to the unnecessary admission of patients under observation status in order to bill for increased patient orders; the failure of Defendants' hospitalists to discharge patients resulting in a greater than average geometric length of stay for certain DRG groups during the relevant time period; Defendants' hospitalists ordering unnecessary consults and therapeutic treatment for patients including nephrology consults, and prescriptions for antibiotics in order to increase RVUs; Defendants' hospitalists signing nurse practitioner RVUs as though the RVUs were performed by physicians; and hospitalists recording visits with an excessive number of patients per day.

7.    During the relevant time period, Relator Guichard used a metrics-based[1] approach to formulate these conclusions, and presented this statistical information both to the clinical staff of Defendant HCA, as well as his direct supervisors with Defendant TeamHealth. Though Defendants indicated that they would take Relator Guichard's findings seriously, instead, Relator Guichard was terminated from his employment.

## II.    **PARTIES**

8.    At all times relevant to this Complaint, Plaintiff Relator Jared Guichard has been a resident of Charleston, South Carolina, and was employed as a hospitalist working at the North Charleston Campus of Trident Medical center, which was owned, operated, and controlled by Defendant HCA.

9.    At all times relevant to this Complaint, Defendant TeamHealth Holding Corporation, d/b/a TeamHealth, Inc. was a corporation organized and existing under the laws of Tennessee. As of January, 2016, Defendant TeamHealth, Inc. ("Defendant TeamHealth") was one of the largest suppliers of outsourced healthcare professional staffing services and administrative

---

[1] As used in this Complaint, "metric" or "metrics-based" refers to quantitative standards of measurement to evaluate outputs, efficiency, or functionality of a system.

services to hospitals and healthcare providers in the United States, serving over 3,400 civilian and military hospitals, clinics, and physician groups, throughout 47 states. *See* TeamHealth, Inc. ("TMH"), Form 10-K, (February 22, 2016). Between 2014 and 2015, Defendant more than tripled the number of hospitals, healthcare clinics and physician groups it served, and, from 2011 through 2015, increased its net revenues associated with its emergency department contracts by over 88%.

10.    According to its own internal policies and procedures, at all times relevant to this Complaint, Defendant TeamHealth provided the hospitalist services for Defendant HCA Healthcare, Inc. at Trident Medical Center in Charleston, South Carolina, including the non-medical administrative, management, and billing services pursuant to a fee-for-service and/or contract revenue arrangement.

11.    According to its compensation arrangement with Relator Guichard, at all times relevant to this Complaint, Defendant TeamHealth was directly responsible for billing and collections from third-party payors, on behalf of Relator Guichard, and Defendant TeamHealth's other healthcare professionals, and/or for accurately monitoring and reporting hours, and patient activity for its healthcare professionals treating patients of Defendant HCA Healthcare, Inc, at Trident Medical Center.

12.    Upon information and belief, at all times relevant to this Complaint, Defendant HCA South Atlantic Division has been a for-profit hospital corporation organized and existing pursuant to the laws of South Carolina, with a principal place of business in Charleston, South Carolina.

13.    Upon information and belief, at all times relevant to this Complaint, Defendant HCA South Atlantic Division has had the exclusive authority to manage, own, operate, and control

Trident Medical Center and its affiliates, hereinafter referred to as HCA Trident. Defendant HCA South Atlantic Division is a subsidiary of Defendant HCA Healthcare, Inc.

14. Upon information and belief, at all times relevant to this Complaint, Defendant HCA Healthcare, Inc. has been a holding company, organized and existing pursuant to the laws of Delaware, with a principal place of business at One Park Plaza, in Nashville, Tennessee, and whose affiliates and subsidiaries included Defendant HCA South Atlantic Division, located in Charleston, South Carolina.

15. At all times relevant to this Complaint, Defendant HCA Healthcare, Inc., by and through its affiliates and subsidiaries, has been involved in the ownership and operation of over 179 hospitals and 122 freestanding surgery centers nationwide. *See* HCA Form 10-Q, (September 30, 2018). According to public record, this network of hospitals included Trident Medical Center, and its North Charleston Campus. *See* www.hcasouthatlantic.com/locations (last visited 12/05/19).

16. At all times relevant to this Complaint Defendant HCA Healthcare, Inc. accepted and received compensation from Government third-party payors including Medicare, Medicaid, Tricare, and affiliated managed care organizations, and/or contracted these rights out to third parties, such as Defendant TeamHealth. As a participating entity in Medicare, Medicaid, Tricare, and affiliated managed care organizations, Defendant HCA had a responsibility to abide by the laws of the United States with respect to seeking and accepting payment from these payors. *See* HCA Form 10-K, (February 21, 2019), (net revenue from Medicaid and Medicare accounted for over 50% of HCA Healthcare, Inc.'s annual revenue from 2016 through 2018).

### III.    JURISDICTION AND VENUE

17. This action arises under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, which among other particulars, prohibits the knowing or reckless presentment, or conduct

causing or acquiescing to presentment, of a false or fraudulent claim for payment to the United States Government. The FCA further prohibits the knowing or reckless creation of a false or fraudulent statement or record used to support payment or approval of payment by the United States Government, and prohibits concealing or avoiding disclosure of information about overpayments or false or fraudulent claims. Finally, the FCA prohibits retaliation, including demotion, termination and/or suspension, against an individual for engaging in protected activity.

18.     This case arises under the laws of the United States. This Court therefore has original jurisdiction over the subject matter of this action. 28 U.S.C. § 1331. In addition, 31 U.S.C. § 3732 specifically confers jurisdiction on this Court for actions arising under 31 U.S.C. § 3730.

19.     This Court may exercise supplemental jurisdiction over the subject matter of the state law claims asserted herein, as the claims are so related to the claims arising in the Court's original jurisdiction so as to form part of the case or controversy. 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. In addition, Defendants conduct business in South Carolina in the Charleston division, or have sufficient minimum contacts with the State of South Carolina in the Charleston division, such that they have availed themselves of the personal jurisdiction of this Court.

21.     This action is based upon information within the personal, direct, and independent knowledge of Plaintiff, and is not based upon publicly disclosed information.

22.     This action was filed in accordance with 31 U.S.C. § 3730(b)(2), in that Plaintiff has provided the Government with a copy of this Complaint, and written disclosure and substantially all material evidence and information in Plaintiff's possession, this Complaint has been filed under seal, and shall not be served on Defendants until the Court so orders, and this

Complaint is based on information and evidence obtained directly by Plaintiff independently, and through his personal knowledge and is not based on, but may provide enhancement to, publicly disclosed information.

## IV.    FACTUAL BACKGROUND

23.    Plaintiff Relator Jared Guichard reiterates the preceding paragraphs as though repeated verbatim herein.

24.    At all times relevant to this Complaint, Defendant TeamHealth has been a for-profit entity providing healthcare professional staffing and administrative services to hospitals and healthcare providers nationwide. *See* TMH, Form 10-K, (February 22, 2016).

25.    According to its own representations, at all times relevant to this Complaint, the services offered by TeamHealth have included:

    a.  Recruiting, scheduling, and credential coordination for clinical and non-clinical medical professionals;

    b.  Coding, billing, and collection of fees for services provided by medical professionals;

    c.  Provision of experienced medical directors;

    d.  Administrative support services, such as payroll, professional liability insurance coverage, continuing medical education services, and management training;

    e.  Claims and risk management services; and

    f.  Standardized procedures and operational consulting. *Id.*

26.    During the relevant timeframe, Defendant TeamHealth was engaged in expanding its hospital staffing business, and as of January 1, 2016, was publicly administering healthcare professionals and services in over 3,400 civilian and military hospitals, clinics and physician

groups, with annual net revenue of over $3.5 billion in 2015, an increase of nearly 100% from 2011 revenues. *Id.*

27.    According to its own representations, during the relevant timeframe, Defendant TeamHealth derived at least 30%, and upwards of 50%, of its revenue from payments from Medicaid, Medicare, and affiliated managed care payors. *Id.*

28.    Upon information and belief, these revenues were paid to Defendant TeamHealth by Government payors for physician services, including services for hospitalists, calculated pursuant to guidelines established by the Center for Medicaid and Medicare Services (CMS), and set forth in the physician fee schedule, and corresponding guidelines.

29.    At all times relevant to this Complaint, the Government healthcare reimbursement system for hospital services has been in transition from strictly fee-for-service to a value-based system. As a provider of hospital staffing services, at all times relevant to this Complaint, Defendant TeamHealth was responsible for understanding and abiding by laws and regulations associated with submitting bills for reimbursement to Government third-party payors, such as Medicaid, Medicare, Tricare and affiliated managed care organizations.

30.    At all times relevant to this Complaint, Defendant TeamHealth's hospitalists were responsible for creating patient records, including corresponding billing codes used to generate bills to be submitted to payors, including Government third-party payors such as Medicaid, Medicare, Tricare, and affiliated managed care organizations.

31.    At all times relevant to this Complaint, Defendant TeamHealth's hospitalists were to ensure that the coding associated with bills submitted for reimbursement to third-party payors, including Government third-party payors, reflected medically necessary services that were actually performed by the associated medical professional.

32.     At all times relevant to this Complaint, Defendant TeamHealth utilized a designated billing company or other entity to bill and collect for the professional services reflected in the medical records created by Plaintiff Guichard and other healthcare professionals employed by Defendant TeamHealth,

33.     At all times relevant to this Complaint, as a condition of employment with Defendant TeamHealth, hospitalists such as Plaintiff Guichard, and other healthcare professionals were required to assign to Defendant TeamHealth all rights to collect the professional fee-for-services rendered by and through the professional's National Provider Identifier (NPI) number.

34.     Accordingly, at all times relevant to this Complaint, Defendant TeamHealth had exclusive control to bill and collect for professional services rendered by hospitalists and healthcare professionals in its employ.

35.     During the relevant timeframe, Defendant TeamHealth's revenues were primarily generated by either fee-for-service arrangements with providers, or through fixed fee contracts with providers with a fee-for-service, or bonus component calculated using measurable activity, such as the number of patients seen per provider, hours billed, or collections per patient. *See* TMH Form 10-Q, (November 4, 2016).

36.     Under either its fee-for-service arrangements, or its contract models, at all times relevant to this Complaint, Defendant TeamHealth was obligated to comply with federal laws associated with billing and collecting from third-party payors, such as Medicare, Medicaid, Tricare, and affiliated managed care organizations.

37.     At all times relevant to this Complaint, Defendant HCA Healthcare, Inc. has been a for-profit nationwide healthcare organization deriving a significant portion of its revenue from inpatient occupancy at its hospitals, its volume of outpatient procedures, and the "medical and

ancillary services ordered by physicians and provided to patients.". *See* HCA Form 10-K, (February 21, 2019).

38.    From 2014 through the end of 2018, the number of overall admissions to Defendant HCA Healthcare, Inc. facilities nationwide increased from 1,795,312 to 2,003,753.

39.    During this same timeframe from 2014 through the end of 2018, the number of Defendant HCA Healthcare, Inc.'s "equivalent admissions"[2] to Defendant HCA Healthcare, Inc. facilities increase from 2,958,674 to 3,420,706.

40.    Upon information and belief, at all times relevant to this Complaint, Defendant HCA Healthcare, Inc. by and through its subsidiaries and affiliates, including Defendant HCA South Atlantic Division, had entered into agreements with governmental third-party payors and managed care organizations for payment based upon the cost of providing patient services, predetermined rates per diagnosis, and fixed per diem rates, such as rates associated with admission.

41.    During the relevant timeframe from 2016 through 2018, Defendant HCA Healthcare Inc.'s national revenues increased from $41.490 billion to $46.677 billion, attributable to a 7% increase in equivalent admissions.

42.    During the relevant timeframe from 2016 through 2018, Defendant HCA Healthcare, Inc annually received over 50% of its inpatient revenue from Medicare, Medicaid, and affiliated managed care organizations.

43.    At all times relevant to this Complaint, Defendant HCA Healthcare, Inc. and its affiliates and subsidiaries, including Defendant HCA South Atlantic Division, and, accordingly,

_____

[2] "Equivalent admissions" refer to a general measure of combined inpatient and outpatient volume. *See* HCA Form 10-K, February 21, 2019.

Trident Medical Center, accepted reimbursement for services, or received compensation for services associated with patient care to beneficiaries of government third-party payors including Medicaid, Medicare, and affiliated managed care organizations, and were responsible for abiding by associated statutory and regulatory requirements with respect to coding and billing.

44.    As set forth by Defendant HCA Healthcare, Inc.: "[HCA] receive[s] a significant portion of our revenues from government health programs, principally Medicare and Medicaid, which are highly regulated and subject to frequent and substantial changes." *Id*. at p. 62.

45.    At all times relevant to this Complaint, Plaintiff Relator Jared Guichard has been a Medical Doctor licensed and in good standing with the state of South Carolina.

46.    Plaintiff Guichard graduated from the Medical University of South Carolina ("MUSC") in 2012, and thereafter completed his residency in internal medicine from MUSC in 2015.

47.    At the time of his hiring, EmCare was the hospital staffing company with whom Defendant HCA Healthcare, Inc. contracted.

48.    Accordingly, on July 7, 2015, Plaintiff Guichard was originally hired by EmCare on July 7, 2015 as a hospitalist at Trident Medical Center's North Charleston Campus.

49.    When he was initially hired by EmCare, Plaintiff Guichard received new-hire orientation, including information about ethics and compliance with respect to billing for services.

50.    Upon information and belief, at the end of 2015, Defendant HCA Healthcare, Inc. did not renew its contract with EmCare, but instead contracted with Defendant TeamHealth for hospitalist services at Trident Medical Center, including the North Charleston Campus.

51.    At the time Defendant TeamHealth contracted with Defendant HCA Healthcare, Inc. for the Trident Medical Center hospitalist practice, Defendant TeamHealth was already providing its staffing services for Trident Medical Center's emergency department.

52.    Moreover, at the time of Defendant TeamHealth's contract with Defendant HCA Healthcare, Inc. for the Trident Medical Center hospitalist practice, Defendant TeamHealth had a relationship with Defendant HCA Healthcare spanning five (5) states.

53.    Accordingly, at the time Defendant TeamHealth contracted with Defendant HCA Healthcare, Inc. for the Trident Medical Center hospitalist services, the entities had extensive knowledge of one another, and each other's operations, billing, and administrative practices.

54.    In or around November of 2015, Plaintiff Guichard executed a contract with Defendant TeamHealth to provide hospital medicine at Trident Medical Center and Colleton Medical Center. *See* TMH Letter of Hire.

55.    In addition to his Employment Agreement, Plaintiff Guichard also received copies of Defendant TeamHealth's Associate Handbook and its Code of Conduct.

56.    As used in the Code of Conduct "TeamHealth" referred to "TeamHealth, Inc. and all of its related entities, companies, affiliates, and subsidiaries. Any reference to TeamHealth physicians denotes physicians who are independent contractors or employees under contract with TeamHealth-related entities, companies, affiliates, or subsidiaries."

57.    Accordingly, Defendant TeamHealth's Code of Conduct applied company wide.

58.    In its introduction, Defendant TeamHealth's Code of Conduct provides:

…TeamHealth is committed to compliance with the federal anti-kickback statute, the Stark Law, the False Claims Act, the Health Insurance Portability and Accountability Act (HIPAA), Deficit Reduction Act, and other applicable federal, state, and local laws, rules, and regulations governing the healthcare industry. To ensure that TeamHealth is in compliance with all state and federal laws, we provide ongoing training on the contents of this manual as well as offer some applicable

situations. Each Associate is required to participate in this training annually. Failure to participate in the Compliance and Integrity training will result in progressive disciplinary action up to and including termination…

TeamHealth Code of Conduct, p. 2, <u>The Purpose</u>.

59.     Defendant TeamHealth's Code of Conduct further provided that, in its commitment to compliance, the Board of Directors was responsible for overseeing Defendant TeamHealth's activities, by and through the Executive Compliance Committee headed by Defendant TeamHealth's Chief Compliance Officer. According to the Code of Conduct, the Chief Compliance Officer was responsible "for implementing all necessary actions to achieve the objectives of the compliance program, including oversight of compliance-related training programs, assessment and review of potential compliance issues, and reinforcement of the Code of Conduct and organization policies." Code of Conduct, p. 3, <u>Program Structure</u>.

60.     The Code of Conduct also includes a number of company norms. For example, with respect to billing information, the Code provides: "Bills generated *on behalf of* affiliated providers should reflect accurate billing for services rendered. Bills are based on accurate coding and on documentation to comply with regulatory requirements that govern reimbursement activities. TeamHealth is dedicated to quality, ethical billing practices and does not condone or participate in fraudulent activities."   (Emphasis added). Code of Conduct, p. 17, <u>Financial and Professional Records</u>.

61.     In addition to its norms, the TeamHealth Code of Conduct includes mandatory employee reporting for misconduct, and violations of state, and federal statutes and regulations.

62.     In addition to the Code of Conduct, upon becoming an employee of Defendant TeamHealth, Plaintiff also received an Associate Handbook. This handbook established the responsibilities of both TeamHealth and its employees, including an emphasis and commitment to

Defendant TeamHealth's compliance obligations, and mandatory training in the TeamHealth Compliance and Integrity program. The Handbook further provided for "False Claims Act Education." TeamHealth Associate Handbook, 2017 §2.06.

63.     Among other obligations, Defendant TeamHealth's handbook promised its employees whistleblower protections, non-retaliation for reporting, and progressive discipline. *See*, TeamHealth Associate Handbook, 2017, §2.01, §2.02, §2.03, § 2.06, §3.11, §4.01, §4.02, §4.09.

64.     All of the materials provided by Defendant TeamHealth emphasize that healthcare professionals should report any conduct they believe to be in violation of federal or state law, regulation, or mandate, and further emphasize that employees will not be retaliated against for reporting these issues.

65.     Despite emphasis on Compliance and Integrity training in its written materials, upon Plaintiff Guichard's transition from EmCare, Defendant TeamHealth did not provide Plaintiff Guichard with additional training regarding his roles and responsibilities, nor did Defendant TeamHealth provide annual Compliance training. In fact, Plaintiff Guichard and the other TeamHealth hospitalists working at Trident Medical Center never received compliance or ethics training of any kind.

66.     Moreover, after Plaintiff Guichard attempted to report compliance issues in accordance with Defendant TeamHealth's own policies, Plaintiff was retaliated against via termination of his employment.

67.     On January 1, 2016, Plaintiff Guichard and all other hospitalists working at Defendant HCA Trident's North Charleston Campus became employees of Defendant TeamHealth.

68.    According to Defendant TeamHealth's Professional Services Agreement, the hospitalists working at HCA Healthcare, Inc.'s Trident Medical Center would be compensated as follows:

2.    **Service Locations; Base Compensation; Scheduling Commitment.** Professional agrees to provide Services under this Agreement for the number of hours or shifts as set forth below at the following Facilities at the following base rates for Services provided by Professional:

| Facility Name | Service Line | Scheduling Commitment |
|---|---|---|
| Trident Medical Center & Colleton Medical Center | Hospital Medicine | 182 Monthly Minimum Standard Hours |

Base Hourly Rate

| Years Experience | Base Hourly Rate – Day | Base Hourly Rate – Night |
|---|---|---|
| 0 – 3.99 | $105.00 | $125.00 |
| 4.0 – 6.99 | $110.00 | $130.00 |
| > 7 | $115.00 | $135.00 |

69.    In addition to paying base compensation, the Professional Services Agreement further provided for three (3) forms of incentive compensation:

3.    During each quarter that Professional provides a monthly minimum average of one hundred twenty (120) hours of scheduled work in the Hospital Medicine Department of **Trident Medical Center and Colleton Medical Center**, in addition to the Base Hourly Rate, Company shall pay Professional incentive compensation as calculated below. Requirements for participation in this plan include >75% attendance at Hospital Medicine business meetings, no suspension of Medical Staff privileges for incomplete medical records, etc., and timely completion of all required Company and Facility components.

4.    wRVU Incentive Compensation: For purposes of this Addendum, the term work Relative Value Unit ("wRVU") shall correspond to that number assigned to the service as published by the Centers for Medicare and Medicaid Services for the appropriate CPT Code and which is in effect at the time the service was provided. Any wRVUs shall be paid at a rate of Five and No/100 Dollars ($5.00) per wRVU. The payments Company makes are the "wRVU Incentive Compensation." Notwithstanding anything to the contrary set forth in this Addendum, Professional acknowledges and agrees that any or all of the Base Hourly Rate, or the compensation paid for wRVUs may be adjusted at Company's sole discretion. Company will give Professional written notice of any such adjustments at least sixty (60) days prior to implementing a change in either the wRVU or Base Hourly Rate. Any payments will be made on a quarterly basis as referenced in the following chart.

**wRVU Incentive Compensation**

| Months Worked | | | Pay Date |
|---|---|---|---|
| January | February | March | June |
| April | May | June | September |
| July | August | September | December |
| October | November | December | March |

5.    Quality Bonus: During each quarter that Professional provides a monthly minimum average of one hundred twenty (120) clinical hours at **Trident Medical Center and Summerville Medical Center**, Professional may receive a quality bonus of up to Five and No/100 Dollars ($5.00) per clinical hour based on achieving targets as agreed to by Hospital and Company, and may include, but are not limited to, the following areas: Core Measures, Patient Satisfaction. Professional must be actively providing full-time (as that term is defined in Employer's employment policies) services at the time of distribution. Any payments will be made on a quarterly basis as referenced in the following chart.

**Quality Bonus**

| Months Worked | | | Pay Date |
|---|---|---|---|
| January | February | March | July |
| April | May | June | October |
| July | August | September | January |
| October | November | December | April |

70. Thus, Defendant TeamHealth paid incentive bonuses both for hours worked and RVUs billed.

71. As a hospitalist, Plaintiff Guichard was responsible for the medical management of hospitalized patients, including decisions to admit or place a patient under observation status, decisions with respect to a patient's clinical course, and decisions on ordering specialty consultations, referrals, and whether to discharge.

72. At all times relevant to this Complaint, the North Charleston campus of Trident Medical Center held over 300 of Trident Healthcare System's 407 beds and was Trident's largest source of new admissions.

73. As set forth herein, while employed for Defendant TeamHealth at Defendant HCA Healthcare, Inc.'s North Charleston campus, Plaintiff Guichard and his fellow hospitalists were compensated on an hourly basis, and received incentive bonuses of $5 for each billed Relative Value Unit ("RVU"), as long as the professional had worked at least 120 hours within the previous month.

74. According to its own documentation, "the term work Relative Value Unit ("wRVU") shall correspond to that number assigned to the service as published by the Centers for Medicare and Medicaid Services for the appropriate CPT Code and which is in effect at the time the service was provided." *See* Addendum to Employment Agreement, ¶ 4, p. 6 of 9.

75. Upon information and belief, at all times relevant to this Complaint, the median income in the areas surrounding Defendant HCA Healthcare Inc.'s North Charleston campus fell below the national average.

76.    Moreover, based upon Plaintiff Guichard's knowledge and personal observations, Defendant HCA Healthcare, Inc.'s North Charleston campus served a large population of Medicare and Medicaid beneficiaries.

77.    While employed by Defendant TeamHealth, Plaintiff Guichard attended monthly physician staff meetings presided over by his TeamHealth Medical Director, Dr. Matthew Madden.

78.    In addition to monthly meetings hosted by Defendant TeamHealth, during the relevant timeframe, Plaintiff Guichard also attended physician meetings presided over by Defendant HCA Healthcare, Inc., and its facility medical director.

79.    Despite attending meetings with Defendants TeamHealth and HCA Healthcare, Inc. from 2015 until his separation from employment in March of 2018, Plaintiff was never asked to participate in training of any kind, including but not limited training related to compliance with federal law.

80.    In 2016, During meetings Plaintiff Guichard attended with the clinical staff of Defendant HCA Healthcare, Inc., it was announced that Defendant HCA had acquired approximately 22 acres near its Moncks Corner campus for $2 million, and that it was undertaking an expansion of its Emergency Department and Operating Suite at Trident Medical Center's primary location, estimated to cost over $13 million.

81.    During his monthly physician staff meetings with Defendant TeamHealth, Plaintiff Guichard's supervisor, Dr. Matthew Madden would address the TeamHealth hospitalists regarding their responsibilities, as well as any issues brought to the attention of Defendant TeamHealth by Defendant HCA Healthcare, Inc. related to Trident Medical Center.

82.    During one of these monthly meetings, where Plaintiff Guichard was in attendance, Dr. Madden informed the hospitalists that Defendant HCA Healthcare, Inc. had noted prolonged

lengths of stay and unnecessary lengths of stay with certain diagnosis related groups (DRGs) at the North Charleston Campus.

83.    At the same time, and pursuant to his daily interaction with clinical staff at Trident Medical Center, Plaintiff Guichard was aware that Trident Medical Center had undertaken an investigation into admissions of cardiology patients under observation status where the patients had normal stress tests, or had otherwise been deemed eligible for discharge by attending cardiologists.

84.    According to reports prepared by the Agency for Healthcare Research and Quality ("AHRW"), the Center for Delivery, Organization and Markets, the Healthcare Cost & Utilization Project, and the National Inpatient Survey, the 2016 mean average length of stay across all hospitals was 4.6 days.

85.    Pursuant to its internal metrics including average length of stay[3] and geometric length of stay, the clinical staff for Trident Medical Center had determined in or around 2016 that there was an overage of cardiology patients who were being admitted under observation status despite normal stress tests, or were not being discharged despite meeting clinical indication for discharge.

86.    Sometime in 2016, Plaintiff Guichard volunteered to work on a team consisting of Trident Medical Center clinical staff to identify and resolve the issues related to prolonged lengths of stay for cardiology patients at the North Charleston Campus.

87.    Using metrics available to the hospital, Plaintiff Guichard and his team attributed many of the overages to cardiology patients admitted under observation status. Pursuant to their

---

[3] In 2016, the average length of stay across HCA Healthcare, Inc. exceeded the mean national average at 4.8 days. This length of stay increased to 4.9 days in 2017 and 2018.

findings, Plaintiff Guichard and his team were able to bring down the average length of stay for cardiology patients at Trident Medical Center's North Charleston campus to better align with the national geometric length of stay.

88.     Following implementation of the cardiology program, Plaintiff Guichard was hired as a physician advisor for the North Charleston Campus by Dr. Shea, the Chief Medical Officer for the North Charleston Campus of Defendant HCA Healthcare, Inc.

89.     Thereafter, Plaintiff Guichard served both as a TeamHealth hospitalist for the North Charleston Campus, and as an HCA Physician Advisor.

90.     In his role as a physician advisor, Plaintiff Guichard was responsible for ascertaining, reviewing, and validating clinical information, and conducting utilization reviews and billing reviews associated with patient admissions and hospital revenues.

91.     In addition, in his role as a physician advisor, Defendant HCA Healthcare, Inc. entrusted Plaintiff Guichard to review claims subject to scrutiny for denial, and to defend claims through supporting clinical documentation consistent with the claim billing codes.

92.     In his role as a physician advisor, one of Plaintiff Guichard's first responsibilities was to review sepsis admissions at the North Charleston campus, which, according to Defendant HCA Healthcare, Inc.'s own metrics, exceeded the national geometric mean length of stay.

93.     According to conversations Plaintiff Guichard had with Defendant HCA Medical Director Dr. Shea, Defendant TeamHealth's admissions under the sepsis DRG were under particular scrutiny.

94.     Specifically, Plaintiff Guichard was instructed to ascertain the reason for the prolonged lengths of stay, and, if possible, to suggest corrections for these overages.

95.     To enable a review and evaluation of the prolonged lengths of stay associated with the sepsis DRG, Plaintiff Guichard created spreadsheets to track pertinent patient information. This information was gathered using clinical documentation available to and used by Defendants HCA Healthcare, Inc. and TeamHealth.

96.     The information Plaintiff Guichard gathered also included payor information. Accordingly, Plaintiff Guichard has personal knowledge that his review, conducted at the request of Defendant HCA Healthcare, Inc., included Medicaid and Medicare beneficiaries.

97.     Ultimately, Plaintiff Guichard tracked sepsis patients from April, 2017 through December, 2017.

98.     In his spreadsheets, Plaintiff Guichard tracked the following categories of information:

    a.   Diagnosis group;

    b.   Attending physician;

    c.   Patient number;

    d.   Cases;

    e.   Patient length of stay;

    f.   Average length of stay;

    g.   Geometric length of stay;

    h.   Patient clinical course; and

    i.   The issues resulting in prolonged or unnecessary length of stay.

99.     After studying the sepsis metrics for over 8 months, Plaintiff Guichard determined that the issues associated with prolonged lengths of stay under the care of Defendant TeamHealth hospitalists included the following:

a. Hospitalists would regularly order unnecessary consults in contravention of a patient's clinical indication;

b. Hospitalists would fail to discharge a patient although clinically indicated; and

c. Hospitalists would order unnecessary antibiotics in contravention of a patient's clinical indication.

100.   In addition, the problems associated with prolonged lengths of stay were exacerbated by certain of the consulting physicians, who, rather than signing off on patients who were no longer medically appropriate for care, would instead follow the patient and perform unnecessary clinical testing.

101.   Plaintiff Guichard's findings are documented in the spreadsheets he assembled using information available to Defendants.

102.   The primary practices Plaintiff Guichard identified as causing prolonged lengths of stay would, incidentally, result in increased patient wRVUs for the ordering physicians.

103.   For example, Dr. Emovon, a nephrologist, was repeatedly and routinely consulted by Defendant TeamHealth hospitalists, and would regularly continue care on patients whose markers were within normal limits.

104.   Ultimately, following Plaintiff Guichard's review of Defendant TeamHealth's hospitalist sepsis admissions, Plaintiff Guichard determined TeamHealth's hospitalists including Drs. Etikerentste, Rojugboken, Backer, and Wall, had engaged in requesting unnecessary consults, and failing to discharge patients whose clinical indications supported discharge.

105.   In addition, during his review, Plaintiff Guichard regularly saw Defendant TeamHealth hospitalists signing off on clinical notes of nurse practitioners who were following patients, converting the nurse practitioner time to physician wRVUs.

106.    Under Defendant TeamHealth's compensation for wRVUs, hospitalists would receive bonuses both for admissions, as well as for procedures performed per patient.

107.    Upon information and belief, this resulted in the number of orders per patient to exceed the mean national average for similarly situated patients.

108.    During his review, Plaintiff Guichard also became aware that Defendant TeamHealth's hospitalists were documenting visits with an unusually large number of patients per day. In particular, physicians who maintained private practices in addition to their work as TeamHealth hospitalists were often tracking the same number of patients per day as Plaintiff, who was tracking roughly 22 to 23 patients per day as a full-time hospitalist.

109.    These same hospitalists, who maintained private practices, would have had to achieve a minimum of 120 hours monthly at Colleton Medical Center and Trident Medical Center to be eligible to receive wRVU bonuses.

110.    At all times relevant to this Complaint, the nationally recognized optimal patient census for hospitalists was between 15 to 18 patients per day.

111.    According to metrics kept internally by Defendant TeamHealth, Plaintiff Guichard regularly noted hospitalists seeing in excess of 20 patients per day, and would bring this to the attention of his supervisors.

112.    During the interim of his DRG review, Plaintiff Guichard would often exchange text messages with his TeamHealth and HCA Supervisors about the TeamHealth hospitalist staff.

113.    On more than one occasion, Plaintiff Guichard noted when a physician had charted doing work that had not actually been performed.

114.    For example, during the relevant timeframe Dr. Wall was a part-time TeamHealth Hospitalist who worked weekends, and would regularly fail to discharge patients resulting in excessive lengths of stay.

115.    During this same timeframe, in order for Dr. Wall to achieve the 120 threshold to be eligible for wRVU bonuses, he would be required to work back to back 15 hour weekend shifts.

116.    In January of 2017, a cardiology patient had been cleared for discharge by the attending cardiologist. In his review of the medical records, Plaintiff Guichard noted Dr. Wall reported seeing the patient but not performing the discharge.

117.    In a text message to his supervisor Dr. Madden in January of 2017, Plaintiff Guichard stated:"…[Dr. Wall] needs to be told to actually do work or not be allowed to work."

118.    Dr. Madden, responded: "I will review. **I have talked to Wall about this in the past and will talk to him again. He is on the short list once we have new hires and increase our manpower…**" (emphasis added).

119.    Plaintiff Guichard again brought Dr. Wall's behavior to the attention of his supervisors for Defendants TeamHealth and HCA Healthcare, Inc. in April and June of 2017. In particular in June, Plaintiff noted that Dr. Wall was "holding on to patients." However, Dr. Wall's behavior continued unchanged.

120.    Plaintiff Guichard exchanged messages with his supervisors throughout 2017 about patients admitted under observation status who were being held inappropriately rather than discharged.

121.    In December of 2017, Plaintiff Guichard completed his sepsis length of stay analysis, and reported his findings to Dr. Shea, his supervisor with Defendant HCA Healthcare, Inc.

122.    Plaintiff Guichard also reported the results of his analysis to his TeamHealth supervisor, Dr. Madden. Plaintiff Guichard informed Dr. Madden in particular that, as it related to the sepsis DRG, Plaintiff was very concerned about the lengths of stay and outcomes for patients followed by TeamHealth hospitalists.

123.    In or around the same timeframe, Plaintiff Guichard also reported internal instances of patient care issues, and verbal and physical abuse amongst the TeamHealth clinical staff.

124.    On January 1, 2018, Plaintiff Guichard notified Dr. Madden that a patient kept over by Dr. Backer needed to be discharged. Plaintiff Guichard further notified Dr. Madden that instead of discharging the patient, Dr. Backer had ordered a consult. In response, Dr. Madden agreed, noting: "[the patient] could have left on [Saturday]. I will speak to Dr. Baker [sic] thanks for letting me know."

125.    On February 2, 2018, Plaintiff Guichard notified Dr. Madden of another patient who should have been discharged, but was instead held under observation status by Drs. Emovon and McDonald. In response, Dr. Madden responded: "I will review and talk to both of them. Obs is becoming a major focus of 2018."

126.    Prior to presenting his findings to his supervisors in December, 2017, Plaintiff Guichard had only positive performance reviews with Defendant TeamHealth, including commendations for his work.

127.    However, in March, 2018, after bringing the outcome of his sepsis analysis, as well as his concerns regarding patient care, billing deficiencies, and inter-personal problems to his supervisors, Defendant TeamHealth terminated Plaintiff Guichard from his employment for cause.

128.    Thereafter, Defendant HCA Healthcare, Inc. attempted to keep Plaintiff Guichard on in his physician advisor role. However, Plaintiff's privileges at Trident were directly connected

to his job with TeamHealth. As such, Plaintiff was separated from his employment as of March, 2018.

129.    To Plaintiff Guichard's knowledge, from the time he reported his conclusions about overages in the length of stay of sepsis patients to his supervisors in December of 2017 until his termination in March of 2018, neither Defendant TeamHealth nor Defendant HCA Healthcare, Inc. instituted any changes to the behavior of the TeamHealth hospitalists.

130.    During his employment with Defendant TeamHealth, Plaintiff Guichard was never the subject of professional warnings or progressive discipline and, instead received commendations and glowing performance reviews for his work prior and following his termination from employment.

131.    Moreover, upon information and belief, and using the practices described herein, during the relevant timeframe Defendants knowingly submitted claims to the Government and received compensation for these claims.

## <u>COUNT I:</u>
### (Violation of the Federal False Claims Act 31 U.S.C. § 3729, *et seq*.)

132.    Plaintiff Relator Jared Guichard reiterates the preceding paragraphs as though repeated verbatim herein.

133.    This is a claim under the Federal False Claims Act, 31 U.S.C. §§3729-3732, as amended.

134.    31 U.S.C. § 3729(a) provides for liability against any person who:

(A)  Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)  Conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(G)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

135.    Through the acts described above, Defendants and their agents, employees, and assigns, knowingly, and/or with a reckless disregard as to their truth or falsity, presented, or cause to be presented to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. 3729(a)(1)(A).

136.    Through the acts described above, Defendants and their agents, employees, and assigns, knowingly, and/or with a reckless disregard as to their truth or falsity, made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

137.    Through the acts described above, Defendants by and through their agents, employees, and assigns, entered into a conspiracy among themselves for the purpose of defrauding the United States Government by knowingly presenting, or causing to be presented to officers, employees or agents of the United States Government false or fraudulent claims for payment, by knowingly making, using, or causing to be made or used, false records and statements material to false or fraudulent claims, and to knowingly sought approval and payment of false or fraudulent claims, all in violation of 31 U.S.C. § 3729(a)(1)(C).

138.    Through the acts described above, Defendants by and through their agents, employees, and assigns knowingly or with a reckless disregard for their truth or falsity made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed, avoided or decreased an obligation to pay or transmit money or property overpaid by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(G).

139.    With respect to claims submitted to the government for payment, as set forth more fully herein, Defendants knew these claims for payment were false or fraudulent, or acted with deliberate ignorance of the truth or falsity of these claims, or a reckless disregard and to the truth or falsity of these claims.

140.    The United States Government was not aware of the falsity of the records, statements, or resultant claims made, used, presented, or caused to be made, used, or presented by Defendants, and, accordingly paid and continues to pay claims the Government would not otherwise have paid but for the acts of Defendants.

141.    By reason of the Defendants wrongful acts, both jointly and severally, the United States has been damaged and continues to be damaged in a substantial amount to be determined at a trial.

### COUNT II:
### AS TO DEFENDANT TEAMHEALTH
### (Violation of the Federal False Claims Act 31 U.S.C. § 3730(h)(1))

142.    Plaintiff Relator Jared Guichard reiterates the preceding paragraphs as though repeated verbatim herein.

143.    31 U.S.C. § 3730(h)(1) provides:

In general – Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor or agent whole if that employee,

contractor or agent is discharged, demoted, suspended, threatened or harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by that employee, contractor or agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

144.    As set forth more fully herein, as a direct and proximate result of Plaintiff Guichard's actions in bringing to the attention of his employer that its conduct, by and through its agents, contractors, or employees, might constitute violations of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* Plaintiff was terminated from his employment with Defendant TeamHealth in March of 2018.

145.    As a direct and proximate result of his termination by Defendant TeamHealth, Plaintiff Guichard sustained actual and special damages, including but not limited to lost wages, gainful employment, and has had to incur attorneys' fees and costs.

146.    Accordingly, Plaintiff is entitled to compensation, allowed by statute, including but not limited to reasonable back pay, special damages including attorneys' fees and costs, and for such additional damages in law or equity as this Court deems just and proper.

## COUNT III:
## AS TO DEFENDANT TEAMHEALTH
**(Termination in Violation of Public Policy Under South Carolina Law)**

147.    Plaintiff Relator Jared Guichard reiterates the preceding paragraphs as though repeated verbatim herein.

148.    As set forth herein, from January, 2016 until March of 2018, Plaintiff Guichard was an employee of Defendant TeamHealth, which, at all times relevant to this Complaint, provided hospitalist staffing and administrative services to Defendant HCA Trident.

149.    As set forth herein, throughout his employment, Plaintiff Guichard acted at all times to ensure Defendants' compliance with state and federal statutory, regulatory, and common law.

150.    As set forth herein, during his employment, Plaintiff Guichard became aware of conduct with respect to billing, coding, patient care, and interpersonal relationships that Plaintiff Guichard determined to be in violation of state and/or federal law.

151.    On numerous occasions, Plaintiff Guichard brought the conduct set forth herein to the attention of his supervisor, Dr. Madden, who, at all times relevant to this Complaint, was a Medical Direct for Defendant TeamHealth in charge of supervising the hospitalists at Defendant HCA Trident.

152.    As set forth above, rather than address Plaintiff Guichard's reports regarding Defendant TeamHealth's hospitalists, in March, 2018, Plaintiff Guichard was terminated from his employment.

153.    Plaintiff was terminated as a direct and proximate result of reporting conduct that was potentially in violation of state and federal law to his employer, and as a result, Plaintiff's termination constitutes retaliatory discharge in violation of public policy.

154.    As a direct and proximate result of Plaintiffs' retaliatory discharge in violation of public policy, Plaintiff has sustained actual, consequential, and special damages.

155.    Plaintiff is therefore entitled to compensation for his damages including lost wages, attorneys' fees and costs, and for such additional relief as this Court deems just and proper.

### COUNT IV:
### AS TO DEFENDANT TEAMHEALTH, INC.
### (Intentional Interference with Business and/or Contractual Relations)

156.    Plaintiff Relator Jared Guichard reiterates the preceding paragraphs as though repeated verbatim herein.

157.    During the relevant timeframe, Defendant TeamHealth was aware that Plaintiff Relator Guichard had been hired by Defendant HCA Healthcare, Inc. as a physician advisor to conduct utilization review.

158.    Pursuant to the terms of Plaintiff Relator Guichard's employment with Defendant HCA Healthcare, Inc., Plaintiff was to analyze the billing and medical records associated with certain DRG groups to determine the underlying causes of prolonged lengths of stay, and to defend claims pursuant to the available medical records.

159.    Accordingly, Defendant TeamHealth knew or had reason to know that Plaintiff Relator Guichard, in his capacity conducting utilization review, would be analyzing records and bills created by Defendant TeamHealth hospitalists and healthcare professionals.

160.    In January of 2018, Plaintiff Relator Guichard brought his sepsis DRG findings to his supervisor with Defendant TeamHealth.

161.    Thereafter, despite knowledge of Plaintiff Relator Guichard's employment conducting utilization and peer review for Defendant HCA Healthcare, Inc., and as a direct result of the outcome of Plaintiff Relator Guichard's assessment, Defendant TeamHealth terminated Plaintiff Relator Guichard for cause.

162.    Upon termination of Plaintiff Relator Guichard, Defendant TeamHealth knew or had reason to know that Plaintiff Relator Guichard would no longer have privileges at Trident Medical Center and his professional staff membership at Trident Medical Center would be terminated.

163.    Accordingly, by terminating Plaintiff Relator Guichard, Defendant TeamHealth intended that Plaintiff Relator Guichard would be unable to conduct additional peer and utilization review at Trident Medical Center.

164.    As a direct and proximate result of Defendant TeamHealth's intentional interference with Plaintiff Relator Guichard's contractual and/or business relationship, and Defendant TeamHealth's termination of Plaintiff Relator Guichard for cause, Plaintiff Relator Guichard has suffered actual damages, including but not limited to lost wages and loss of employment opportunities.

165.    Plaintiff Relator Guichard is thus entitled to judgment against Defendant TeamHealth, and for actual, consequential, and punitive damages.

**COUNT V:**
**AS TO DEFENDANT TEAMHEALTH**
**(Breach of Contract Accompanied by Fraudulent Act)**

166.    Plaintiff Relator Guichard reiterates the preceding paragraphs as though repeated verbatim herein.

167.    At all times relevant to this Complaint, a contract of employment existed by and between Defendant TeamHealth and Plaintiff Relator Guichard.

168.    Under this contractual arrangement, Plaintiff Guichard agreed to assign and allow Defendant TeamHealth to collect Plaintiff's professional fees associated with care Plaintiff Guichard provided to patients at Colleton Medical Center and Trident Medical Center.

169.    In consideration for this assignment, Defendant TeamHealth agreed to pay Relator Guichard as set forth in the addendum to Plaintiff Guichard's employment agreement.

170.    A material provision of Plaintiff Guichard's employment was non-retaliation for reporting to Defendant TeamHealth billing and collections practices alleged to be in violation of federal law.

171.    From December of 2017 through March of 2018, Plaintiff Relator Guichard reported compliance issues to his TeamHealth Supervisor, Dr. Madden, as well as his HCA

2:20-cv-00250-DCN    Date Filed 01/24/20    Entry Number 1    Page 32 of 35

Healthcare Supervisor, Dr. Shea, related to bills submitted by TeamHealth hospitalists in contravention of federal law.

172.    In March of 2018, Defendant TeamHealth terminated Relator Guichard under section 11.1(vii) of Relator Guichard's employment agreement. Under this subsection, a TeamHealth employee could be terminated without warning for cause for "acts of Professional which involve professional misconduct, dishonestly, moral turpitude, criminal acts, or any act which in good faith judgment of the Company impairs or adversely affects the relationship between Company and Facilities[.]"

173.    At no time during his employment with Defendant TeamHealth did Plaintiff Relator Guichard ever receive progressive discipline or undergo corrective actions for his conduct.

174.    Rather, upon information and belief, the basis for Defendant TeamHealth's decision to terminate Plaintiff Relator Guichard was pretextual, and instead, was pursuant to Plaintiff Relator Guichard engaging in protected reporting activity.

175.    Defendant TeamHealth's pretextual termination of Plaintiff Relator Guichard constitutes a fraudulent act.

176.    Accordingly, Defendant TeamHealth fraudulently breached its employment contract with Plaintiff Relator Guichard by terminating him for pretextual reasons, when, in fact, the termination was caused for engaging in protected reporting.

177.    As a result of Defendant TeamHealth's fraudulent breach of contract, Plaintiff Relator Guichard has suffered and will continue to suffer actual, consequential, and special damages, including reputational harm.

178.    Plaintiff Relator Guichard is thus entitled to judgment against Defendant TeamHealth, and for actual, consequential, and punitive damages.

## COUNT VI:
## AS TO DEFENDANT TEAMHEALTH, INC.
### (Breach of Contract)

179.    Relator Jared Guichard reiterates the preceding paragraphs as though repeated verbatim herein.

180.    As set for the herein, at all times relevant to this Complaint, Relator Guichard was operating under and subject to the TeamHealth Code of Conduct, and the policies, procedures, and mandates of the TeamHealth Associated Handbook, including an obligation to report allegations of misconduct.

181.    In exchange for abiding by the TeamHealth Associate Handbook, Relator Guichard received good and valuable consideration, in the form of employment and compensation.

182.    As set forth herein, throughout his employment with TeamHealth and HCA, Relator Guichard reported serious patient-care issues by certain TeamHealth physicians and further reported improper billing practices. In addition, Relator Guichard also reported human resource-related issues to TeamHealth, including to his direct supervisor Dr. Madden, and pursuant to TeamHealth's own mandatory policies and procedures (Code of Conduct and Employee Handboook).

183.    These issues included but were not limited to allegations of abuse and/or misconduct among and between members of TeamHealth staff toward one another.

184.    To Relator Guichard's knowledge, despite bringing allegations of abuse to the attention of his supervisors, no further investigation or corrective action was taken with regard to these issues.

185.    Instead, and in direct violation of its own policies and procedures, after Relator Guichard reporting human-resource issues to his direct supervisor, Relator Guichard was terminated from his employment with TeamHealth.

186.    This termination, which was later documented as "for cause," was, in fact, retaliatory action against Relator Guichard for reporting as required under the TeamHealth policy. Prior to his official termination, and due to his concern that the termination constituted retaliation in violation of the TeamHealth Handbook, Relator Guichard left a message with Genni Morales of TeamHealth Human Resources. However, he received no response.

187.    Defendant TeamHealth's retaliatory actions set forth above, up to and including wrongful termination, constitute a breach of Relator Guichard's employment contract with TeamHealth as supplemented by TeamHeath's promises of non-retaliation for good faith reporters of legal and ethical violation stated in its Handbook and Code of Conduct.

188.    As a direct and proximate result of this breach, Plaintiff Relator Guichard has suffered actual damages, inducing, but not limited to lost wages and loss of employment opportunities, and future damages. Plaintiff Relator Guichard is thus entitled to judgement against TeamHealth, and for actual and consequential damages.

## TRIAL BY JURY

189.    Plaintiff Relator hereby demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff-Relator, on behalf of herself and the United States Government prays that this Court find on her behalf and order the following:

(i)    With respect to claims arising pursuant to 31 U.S.C. § 3729, *et seq*., judgment against

Defendants in an amount equal to three times the damages sustained by the United

States Government as a result of Defendants' conduct, plus a maximum civil penalty of $11,000.00 for each and every violation;

(ii)     Judgment to the relator up to the maximum amount allowable pursuant to 31 U.S.C. § 3730(d); and

(iii)     An award to relator for the attorneys' fees and costs associated with this action pursuant to 31 U.S.C. § 3730(d); and

(iv)     With respect to claims arising pursuant to 31 U.S.C. § 3730(h), an award including but not limited to 2 times the calculable back pay with interest, and compensation for special damages including costs and attorneys' fees; and

(v)     With respect to claims arising under state law, liquidated damages associated with the retaliatory discharge, along with attorneys' fees and costs; and

(vi)     Such other relief in law or equity as this Court deems just and proper.

*s/ Jessica L. Fickling*
Jessica L. Fickling, Esq. (Fed. Id.# 11403)
STROM LAW FIRM, L.L.C.
2110 N. Beltline Boulevard
Columbia, South Carolina 29204
Telephone: (803) 252-4800
Facsimile: (803) 252-4801
jfickling@stromlaw.com

Shawn D. Wallace, Esq. (Fed. Id.# 4506)
Stephanie N. Ramia, Esq. (Fed. Id.# 11783)
YOUNG CLEMENT RIVERS, LLP
25 Calhoun Street, Suite 400
Charleston, South Carolina 29401
Telephone: (843) 577-4000
Facsimile: (843) 579-1326
sramia@ycrlaw.com
swallace@ycrlaw.com

*Attorneys for Plaintiff-Relator Jared Guichard*